Good morning, Your Honor. Jens Kepke, Granus Martin, appearing for appellants. The primary issue here is that the summary judgment was erroneous because there are genuine issues of fact with regards to both the malpractice and fiduciary duty claim. Counsel, help me on a factual issue that I'm not sure I got. This English tax return document made the case a great deal worse for Blix Street Records and Strahl. And that's when the Proskauer firm turned around and said, oh, this is a bad case, you better settle. What I want to know is, when did the Proskauer firm have the tax document? They had it five or six months, October 2005, Your Honor. They had it five or six months prior to the, what I like to call the come to Jesus talk, that were the litany of weaknesses. October, did he say? 2005. And the premediation... Five or six months before the talk. It was produced by Hot Records to Proskauer and to the plaintiffs in the underlying Cassidy litigation as well. Okay. Now tell me another thing. Typically, in a legal malpractice case, the claim is, on the case within the case, we lost and we would have won if the lawyer had done a competent job. For example, we had a great tort case and the lawyer missed the statute of limitations. So we lost our tort case and we've had expert witnesses, other lawyers, say it was worth a certain number of dollars. This case, there's really nothing to contradict the notion that the case was a dog because of the tax document. And it looks to me as though the issue is running up a lot of fees between when the tax document was in Proskauer Rose's hands and when they had what you called the come to Jesus talk, five or six months of fees, a lot of money. I could not find authority that established that that kind of money, the attorney's fees for discovering that you have a bad case later rather than sooner, is awardable as damages in a legal malpractice case. What's the authority? Well, I think I want to answer that question. Then I want to give you another example where I don't think the earlier standard that you said applies. Okay. That's fine. But answer my question first. Absolutely. I think the authority is the Sindel case. Which? Sindel v. Gibson and Dunn. If you want the citation, I can dig it out. I've got the case. Okay. And so there is that question. And I think just to put a finer point on Your Honor's point, where the causal damages are with regards to that malpractice. You've got this allegedly bombshell document in your possession, and apparently you don't do anything about it. You don't talk to the client in any fashion or try to deal with that grave weakness. And then you have this five-, six-month period where you're incurring a lot of fees before you suddenly say it's a problem. That period of fees is a recoverable causal amount of damages, even if you assume that the exact same bad settlement that was reached was eventually reached. So even if you get no more favorable result, that amount of damages are directly causally related, and so they should be recoverable. So accepting that, so as I understand it, Proskauer had in its possession boxes of documents from Flick's. And it was sitting there, but there's no evidence that any Proskauer lawyer had actually reviewed that document in the course of their review of the records. Is that right? I don't think the record is particularly clear on it. The summary judgment record definitely is not clear about that. There's at least genuine issues as to what happened there. So, but Flick's knew that it had filed this tax document based on royal percent and interpreting the document as a percentage of royalties. It knew that. Why didn't Flick's tell its lawyers or say, hey, here's our tax fund? Why did it take the Cassidys to produce the document? I mean, Flick's filed its own tax returns, and now they could have stopped that excess amount of litigation costs by simply showing the filing to your attorneys. How come that didn't happen? I think, and what happens in the real world, Flick's turned over, I think, or was looking through 20,000 documents. Believe me, I've been in the real world. Okay? Litigation partner. I understand. And in that real world, clients have thousands and thousands of documents, and they may not realize the full significance or realize the relationship. This document was of particular significance because it concerned the critical issue in the underlying case, whether or not the Cassidys had a right to interfere with the BBC production because how the royalty agreement was, how they were interpreting the royalty agreement. And it turns out that your client was interpreting it one way for purposes of tax returns and another way for purposes of your dealings with the Cassidys who sued you. And you knew that. I mean, that's the reason I'm not saying that prosecutors maybe should have reviewed the documents or if they had reviewed them if they should have immediately understood the circumstances, but your client always knew that. Your client's a lawyer, too, right? Yes, he is. And he's been in that business for a long time than anything that would have. And he knew that you were talking about royalties. Exactly, but he's not a tax lawyer. And so the significance, first of all, it really has nothing to do with the BBC documentary. It has to do with how you characterize it. It's what you call the money. And his position was, look, I'm paying the taxes one way or the other in the U.K. or in the U.S. and I was told this was the way to do it. And then he put it aside. It happened years ago. He didn't put two and two together in terms of the relationship between this and later litigation because under his view of the industry, it was always clear that the hot records deal, you know, was properly characterized. But the Cassidys certainly found that document and understood its implications. Say that again. I'm sorry. The Cassidys found the document, produced the document. They understood its implications. They did. And Proskauer didn't and neither did the client. We're not sure Proskauer actually reviewed all the documents that were turned over by the client. The record shows that they had it, that they, you know, they spent millions of dollars in fees in dealing with documents, most of which had to do with the documents, they say, and they did. But I do want to get to a very important point. Judge Wardlaw knows much more about this than I do, but I would guess that a big law firm, instead of the one solo practitioner handling the case and looking at all the documents, that things get delegated to associates, different people look at things. It probably takes time before the boxes of documents are gone through, as it does in a solo practitioner's lawyer too. I know there's something that you say you want to get to. Yes. But I also want to get to something. No, and that's the most important thing today. Well, thank you for that. But it has to do with the claim for malpractice that had to do with setting aside the settlement that your client said that the lawyer would not argue to set aside the settlement right after. Is that what you want to talk about too? Yes. Okay, well, good. This is terrific. The meeting of the minds. Now, obviously on that, you would have to show, I think to prevail on this, you have to show a likelihood that somehow you would have gotten a better result. And he went out after, hired another lawyer, the state court of appeal said, oh, it was missing a signature, sent it back, but the trial court still enforced it. So the ultimate result was that the agreement still got enforced. So how does your client show that he would have gotten a better result? All right, two things. One, for the purposes of the refusal to instruct, I don't think that there is the burden to show a more favorable result. Because here that burden exists when you're saying, look, this was a bad settlement. I'm challenging whether I should have been told to enter this settlement. The malpractice here is based on you were given an instruction to make an argument. You refused to do so. Now, the fact that you refused to do so. Don't you have to show that the argument still, I mean, you can just say, well, my lawyer didn't mention that when I was three years old such and such happened. It has no relevance of anything. A person can then show that that entitles them to money? Because they left out something that they wanted the lawyer to say, even though it has nothing to do with anything, wouldn't have changed any results? Well, that's not our facts here, right? This was very pertinent. And the California Court of Appeal said that the two grounds that the prosecutor was specifically instructed to make were good grounds. You didn't have enough parties sign it, and it was incomplete because of that. Okay, but why did the court enforce it then? Because of judicial estoppel. So it really ties right back into the malpractice. What the court on remand said is, I agree with the Court of Appeal that this settlement agreement, as a matter of 664, is not enforceable because the proper parties did not sign it. And it wasn't Mr. Straub, right? He signed it, right? Yes, absolutely. But the reason that it remains enforceable today is because the lawyers did not, in the first hearing after the mediation, instead of telling the court, look, we've got problems with this settlement agreement, it's not enforceable, they said the opposite. The settlement has been entered, it's just subject to a long-form agreement. That judicial estoppel is what now we find makes it binding. So the malpractice of not following the instructions definitely caused harm, and the harm is all those fees that Blix had to incur to make a successful fight to overturn the settlement. That would not have – it doesn't matter what the ultimate result – Did it make a successful fight to overturn the settlement? Well, it is on the grounds where the malpractice is, right? Because those grounds were successful. The ultimate – the ultimate – No, what I meant was he never did succeed in overturning the settlement, right? Well, as of today, you're right. Because of – because of the malpractice in terms of not following instructions, he's judicially stopped from making that argument. But he thought – he thought that the – that the instructions the client was giving him were contrary to law. And when – if he thought that, if the – if a client is giving you instructions to do something that you feel is either unethical or contrary to law, what is the lawyer supposed to do? I mean, quit? There's two – there's two – there's two choices you have. If he really believes that it's unethical to make the argument, you withdraw. You tell the court, I can't, and I think the court – I think the decision of this court in Perez says that, that you withdraw. You tell the court, you know, we have a conflict with a client. Can we continue this hearing? He needs to find new counsel. That's what you do. But here, you know, we have to remember that the argument that was being asked to make was not unethical. It was actually accepted by the California Court of Appeals. As it turned out. But at the time, he felt – I mean, he believed. The settlement had been entered, the mediator believed it, and everybody seemed to think all it had to do was to be reduced to long form. That's the – that's the choice that the attorney has. If you have a – if you are asked to do something that's – and you believe that it's unethical, then you withdraw. The counsel insists that that is the course they want to take. Could we back up to something that's still bothering me about that box of documents? Yes. I was thinking it was probably pretty obvious to the Cassidys that saying something is licensing fees or royalties according to which is to Blix's advantage at the time is a very big deal. It was probably obvious to Blix and to Straw that it's a big deal. But I'm thinking you get a box of documents or probably multiple boxes in a law firm and you've got a bunch of associates to whom they're parceled out to do document review. I would think that it would be quite a time-consuming process before somebody who wasn't handling the whole case actually got to the document and realized that it was a big deal, as would be obvious from the get-go to the principals. How long should that take? Well, you have to keep in mind that the question of how to characterize the hot records deal from day one was always in dispute, was always an important deal. So, again, we're somewhat speculating here. Always important, but I would think you get a lot of advantages from hiring a big firm. You don't have a lawyer who's not available today and not available for the next week and only has little bits of time. You also get some disadvantages, and you know what's going in. You know that multiple people are going to be handling the case and there's a coordination issue. And I don't know how long it is before it's malpractice for all the information, all the knowledge to be gleaned and then coordinated and understood. Well, again, and there's not an absolute answer to that question, most likely, but the reality is the hot records deal and how it was going to be characterized was an important point from the get-go. And if you got a bunch of documents from hot records and you knew that it was an important fact in the case, presumably it would be an important priority to go through those. I know my time's up. I'd really like to reserve. I'd like to sit down and beg two more minutes to rebut. Your time is expired, but we'll give you one minute. Thank you, Your Honor. I appreciate it. Split the baby. You know, the wisdom of Solomon here. May it please the Court. I'd like to get to the issues that the Court raised. And one is that Mr. Dixler purportedly failed to follow Mr. Straw's instruction to ---- That bothers me. I did think that when my client gave me an instruction that I thought was wrong in one way or another, well, it happened occasionally, and first I would try to talk him out of it. That always succeeded. But I thought if I wasn't able to talk him out of it, I had to quit. I couldn't just hold on to the case and quit billing him. Well, the problem with the argument about failing to follow instructions is that it's not supported by the evidence. So I'd like to discuss the very specific evidence. Mr. Dixler, in support of the summary judgment motion, stated that Mr. Straw told him to argue that the agreement wasn't intended to be binding. And Mr. Dixler said, I'm not going to argue that. There's a 664 provision. It was clearly intended to be binding. In opposition to the summary judgment motion, Mr. Straw denied having given Mr. Dixler that instruction. He said, I never told him that. And what's interesting about Mr. Straw's ---- so that can't be a basis for a failure to follow instructions. In his declaration, yes, in opposition to the summary judgment motion. Declaration? Yes. So that can't be a basis for a failing to follow instructions. It's also interesting that in Mr. Straw's declaration or any evidence in opposition to the summary judgment motion, there's no evidence of what Mr. Straw actually did instruct Mr. Dixler, except there is a letter that Mr. Straw sent to Mr. Dixler that Mr. Straw submitted, dated April 3rd, that he sent to Mr. Dixler before that hearing where the settlement was announced to the superior court. This was on April 3rd. And it's in that letter, Mr. Straw says, Mr. Dixler, I want you to tell the Court here's what I want. I want to make sure that the case isn't dismissed. I want to make sure that the Court doesn't say that the written, handwritten settlement agreement in and of itself is enforceable, because what I want to be able to do is negotiate further terms in a long-form agreement, and that's specified in the letter. He said, I don't want the case dismissed, and I don't want the Court to find that the agreement is in and of itself a complete agreement. Then you look at the transcript, which is in the request for judicial notice that was filed in opposition, actually, to the summary judgment motion, and it shows that this is what Mr. Dixler said. He said, yes, Your Honor, the matter subject to having the long-form agreement prepared and obtaining the approval of the bankruptcy court with respect to the Gelbart piece and the Ivocasky partners piece. The case is settled subject to those two provisions, which we expect will be resolved in the next 30 days. So Mr. Dixler explicitly followed the instructions that are set forth in writing in that April 3rd letter. Also equally important is the August 17 judgment, 2000. Was Mr. Straw present when the Court was having this dialogue? Yes, Your Honor. And in fact, you're reading my mind. Okay. So did the Court talk to – I know when I used to do these, I would talk directly to the parties that were there. What happened? This is reflected in the latest request for judicial notice of the August 17, 2009, judgment and the statement of decision. We objected to it, but we withdraw our objection. But here's what the Court said. The Court said that Straw never instructed Dixler to inform the superior court that the case was not settled. This is a quote. Straw testified that in the in-chambers conference, that was right when they spoke to the judge before they came out and announced the settlement. Straw testified that in the in-chambers conference, he believed the settlement agreement was not enforceable, but that he said nothing. He testified that, quote, even before we were in the courtroom, I considered having my attorney say something, but decided not to do so. That was the finding by the Court. So this whole thing about Straw telling Mr. Dixler to announce to the Court that the agreement wasn't enforceable is completely wrong. And Mr. Straw testified under oath after remand in the trial to determine whether to enforce the settlement agreement that he remained silent. The Court went on to say, and this is a quote, on cross-examination the first question directed to Mr. Straw was, didn't you think the judge was entitled to know that you thought the agreement was not enforceable? There was a long pause and a halting answer which was never directly responsive to the question. It was apparent to the Court from this testimony that he recognized the implications of not saying anything to the Court, but did not know how to justify or rationalize that decision he had made to remain silent. He testified at other times that he didn't want to say anything to disrupt the process because he thought that these issues could be worked out in negotiations in the long-form agreement. So that's what really happened. There is no evidence to support the argument that Mr. Dixler refused to follow his client's instructions. So I get it. I'm sorry. I get it. Let me back you up to the box of documents for a minute. One of the things that you do for your clients is when that case is a dog, you tell them sooner rather than later that they don't run up a fortune in attorney's records before finding out on the courthouse steps that it's a dog. As I understand the case here, it's not that at least the case to the extent it's strong, it's not that Blix had a great case and Proscow or Rose let it fail, it's that Blix had a lousy case where Proscow or Rose kept the meter running until long after Proscow or Rose should have advised Blix that it had a lousy case. And that tax document is critical. What evidence is there on what excuse there is for not discovering it and advising Blix records sooner? A two-part answer, Your Honor. Number one, Your Honor was correct that there is no legal authority for the plaintiff, for lack of a better word, continuing to bill fees upon discovery or nondiscovery of a weakness in a case. Because under the Oreck case, I think that Sindel case might be extended to it. There's some argument as to whether to extend Oreck or extend Sindel, I think. I think I can distinguish the Sindel case, because what the Oreck case said is that the fees paid to your own attorney are not tort damages. And that's what we're talking about when you're saying continuing to bill. Nor to a new attorney. In the Sindel case, the same factor ---- Let's assume that either one might, for purposes of this question, let's assume that either case might arguably be either distinguished or extended so that that part is up in the air. I agree with you that Oreck may very well mean that that is not available damages for malpractice. But let's assume the contrary for purposes of discussion. What evidence is there on Proskauer-Rose's justification for not finding the smoking gun sooner rather than later when it was in the box? The evidence is as follows. Mr. Straw testified that he never gave that document to Proskauer. That document first came to light when the Cassidy's attorneys subpoenaed Hot Records. Oh, so it wasn't in the box? It wasn't in it. Mr. Straw gave 250 boxes to Proskauer. It was not in any of those boxes. How do we know that in the record? Where is it? Where is that? Yeah, Straw gave 250 boxes to Proskauer-Rose's, and they didn't find this document in five or six months, and it wasn't even there. That's important. So I want to know how to find it in the excerpts. That's not what happened. I'll get the citation from the court. But just so we can understand what happened. Mr. Straw testified that he never gave that document to Proskauer. What happened was that in October of 2005, the Cassidy's subpoenaed Hot Records, which was a United Kingdom entity. They produced the documents at that time to the Cassidy's lawyers and to Proskauer. Proskauer had an associate review it. But the Cassidy's did not raise the issue of the representation in that document, that it was a license agreement, that it undermined Mr. Straw's case or Blake Street's case. Cassidy's didn't raise that until February of 2006, and they said, aha, look what we have. We want to take Mr. Straw's deposition again to see why he made this contrary representation to the tax authorities. So the issue was not raised by the tax authorities. That doesn't really help. If you have something really good that's going to destroy the other side, often you just lie in the weeds with it. What matters to me is I think you're saying that in October 2005, both sides had it from Hot Records. That's correct. That's correct. The Cassidy's did not raise the issue. So how come Proskauer Rose didn't say, whoa, I don't know if the Cassidy's realized this or not, that this thing just destroys our case? Well, Proskauer Rose didn't do that. There's no evidence that Proskauer Rose did do that. But that's not malpractice because. Why not? It's not malpractice because there's no evidence that let's assume that Proskauer had realized that and showed the document to Mr. Straw. Mr. Straw thought that the document wasn't harmful. There's no evidence that then he would have settled or the Cassidy's would have settled. That's why you have that standard. But we have two claims here. One is the claim of negligent provision of settlement advice. That's one claim. But the other claim is breach of fiduciary duty. Why isn't it the attorney's fiduciary obligation to review the documents and come up with the ones that are harmful to the case and advise the client? Well, I think that's a negligence because that would be a negligence claim, not a breach of fiduciary duty, because breach of fiduciary duty would be intentional in my understanding. And the only argument made below by Blake Street was that the Proskauer firm overbilled. So on the document, everybody had the document. And the case law says that overbilling is not malpractice. Okay. But going back to the document, everybody had it. It's just various people recognized its significance in this litigation at various times. Yes. The Cassidy's didn't, for all we know, the Cassidy's lawyers didn't recognize the significance for five months. They didn't tip their hands. We don't know. But that doesn't mean that your lawyers don't have some sort of independent duty to evaluate. You know, you don't wait for the other side to tell you that they're going to slam you. But I think what we have to go back and focus on, even if that's true, is causation and damages. Because you're going to always be able to go back in a case and nitpick this or that California law says that you have to demonstrate that either the Cassidy's would have settled for less money, and Bullock Street didn't present any evidence of that in opposition to the summary judgment motion, or they would have done better at trial. And what they had to do was basically put on their case, put on witnesses from the underlying case, put on documents from the underlying case. They didn't do any of that. But he didn't get to put on any evidence that – did he get to put on any evidence at trial that they should have discovered this on such and such a date, so therefore I shouldn't have to pay attorney's fees from that? Yes. They did. And the jury rejected it. They put – in the trial, they put on all of that evidence. The court did not exclude any such evidence. They were allowed to present that evidence. The only thing the trial court did was say you can't argue that that's malpractice. You can't say that that's a breach of fiduciary duty. And the jury awarded every penny. They argued that Crossgower wasn't prepared for trial, that they overbilled, everything. That was all done in trial, and the jury ruled in favor of Crossgower. But again, I really think that the court needs to focus on the causation and damages issues, because no evidence was presented that the Cassidys would have settled for less money or that Blick Street would have done better at trial. And, in fact, the district – Wouldn't it be the opposite, that Blick's would have been softer in settlement? Blick's would have thrown more money at the case? Had Blick's lawyers told Blick's, your case is really bad because you said one thing to the tax authorities and another thing to the Cassidys? Well, they would – Blick Street would have had to prove that that's what the Cassidys would have done, and there's no evidence of that. Well, it's more a matter of what he would have done. No. No, it's what the Cassidys would have done. I've been on both sides of this problem where some evidence turns up that's devastating to one side, and usually the side that suffers the really devastating evidence is the one that folds. But here's what is difficult for me to comprehend, is that Mr. Straub, or Blick Street, has taken the position that even in light of that document, he didn't want to settle. He's been fighting to overturn that settlement agreement for three years. So to say if he had known about it three months earlier that he would have said, call off the case, stop everything, capitulate, is belied by the history of the last three years. So your argument basically is Mr. Straub just wasn't going to see the value of it no matter what. Absolutely. And whether you hit him over the head five months before you hit him over the head on the eve of the trial, he still thinks that he should have not had to settle. To this day, he still wants to litigate the case, even with that document. So in the trial, you – Proskauer now sues Blicks for its outstanding fees. Correct. And Blicks countersues for all this malpractice. And they made all these arguments that they're making again now, and the jury found for Proskauer. Correct. They even mentioned to the jury about, you know, Mr. Dixler, you know, the 24-7, you know, didn't relish trial. You know, Mr. Straub mentioned that. They brought in Dorothy James, who testified. But his argument would be – Mr. Straub's argument would be if he had been allowed to call it malpractice, that maybe the jury would have given it more weight. Sure. He was saying that if he would have been allowed to say it was malpractice and breach of judiciary duty, the jury would have ruled for Blicks v. on the breach of contract claim. And that's just not proper because it was adjudicated. He was able to present all of the same evidence. He just wasn't allowed to call it malpractice. And the reason why is because the only issue before the jury was the contract claim. That's why you would – that would be your argument. If, in fact, if we decided that it was malpractice, then you would say it was harmless. Correct. Because he just – he still put in all the same evidence. He just didn't have the benefit of the label. But he would argue the benefit of the label would have affected the jury in terms of it would have given a sort of an imprimatur to his point, and therefore, you know, he would have at least been able to back out those feats. Right. But I think that would have been improper because the jury found that Proskauer was entitled to every penny under a contract theory. And they're not entitled to deduct that or not award those based on malpractice when there's no evidence of causation of damages. They're not able to conflate the different causes of action. There's different standards that have to be met. And just by saying malpractice, you can't use that word to diminish a contract claim because there are other – there's other evidence that you have to present in order to be able to use that word. I understand what you're saying. And they didn't do it. Thank you, counsel. Can I make three points in one minute? Let's see. The first, the evidence about the refusal to instruct comes straight out of Dixler's declaration on ER3331. He says, Mr. Strachan instructed me to argue the settlement agreement was not intended to be binding. His stated reasons were as follows. Two parties in the Cassidy action had not signed the settlement agreement. Then he says, I declined to follow his directive. It's in the summary judgment record in and of itself. So the evidence is – and in Strachan's declaration, he says, I told him to make this argument and he refused to. That's at least a genuine issue, if not an absolute clear piece of undisputed evidence. Two, the more favorable standard that we were talking about, again, our position is that does not apply in the refusal to instruct because you have these causally related attorney's fees that are there regardless of what the outcome was. And three, in terms of the trial, in terms of the prejudice on trial, BLICS was not entitled at trial to argue that it had affirmative defenses based on malpractice or that it had a counterclaim based on malpractice or to put its evidence in any So it's hard to argue that a jury hearing a complete case of a breach of contract for fees and then affirmative defenses and a counterclaim about malpractice without a bunch of objections would have come out the same way. And in fact, Kroskauer has the burden of showing that it's harmless and they haven't even come close to doing that. On top of that, there were important pieces of evidence that didn't come in at months, we suddenly stopped paying. That's a pretty important question the jury would have. We weren't able to put in evidence of that. That really would have changed the result. Oh, I have a few seconds here. The last thing I want to leave you with is we have to remember this is occurring in the context of summary judgment. And so under this circuit's decision in Nissan Fire, the initial burden of like causation. They have to at least come forward with negating any evidence of causation. So if they believe that the more favorable standard applies here, they had the initial burden of essentially showing that this was an unwinnable case below. And they didn't do that. So before that, and the district court kind of glided over that and immediately said, well, how are you going to show this? But I think that was an important skipped step. Have the parties attempted mediation in the Ninth Circuit? Gone to the Ninth Circuit mediators? I believe that we were contacted by the mediation office. And the parties have not gone through the process, though, no. Do you think it would be helpful? I would be happy to talk to my client and we would consider that. That's not really what I asked. I don't know the answer to whether we would be willing to do that or not. How about Proskauer? I think, Your Honor, we did engage in some discussions and they were not even close. With our mediator? Without the mediator. I don't think that they'd be helpful. Okay. Thank you. Thank you. Thank you, counsel. Proskauer Rose v. Blick Street is submitted. And we are adjourned for the day.
judges: Kleinfeld, Wardlaw, Callahan